**STATE of Iowa, Appellee,**

v.

**Lary Lane MORGAN, Appellant.**

No. 95–322.

Supreme Court of Iowa.

Jan. 22, 1997.

Linda Del Gallo, State Appellate Defender and Ahmet S. Gonlubol, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, Michael Short, Lee County Attorney, Bruce C. McDonald and Gordon Liles, Assistant County Attorneys, and Gerald Partridge, Washington County Attorney, for appellee.

Considered by HARRIS, P.J., and CARTER, NEUMAN, SNELL, and ANDREASEN, JJ.

CARTER, Justice.

Lary Lane Morgan appeals from convictions for first-degree murder, first-degree kidnapping, and first-degree sexual abuse, urging several grounds for reversal. We vacate Morgan's first-degree sexual abuse conviction and otherwise affirm the district court's judgment.

Nine-year-old Anna Marie Emry and her brother, Austin, were spending the weekend of August 12–14, 1994, with their uncle, Robert Emry, in Brighton, Iowa. Robert was caring for these children while their parents celebrated their tenth wedding anniversary. On the evening of August 12, the appellant, Lary Lane Morgan, and his son, Robbie, paid a visit to the Emry home. Morgan was a friend of the Emry family and had previously helped Robert remodel his house. Morgan, who was divorced, was in Brighton to exercise visitation with his son. Robert and Morgan spent the evening drinking beer and conversing while the children watched rented movies and played in Robert's hot tub. Morgan and his son left the Emry home at approximately 12:15 a.m.

When Robert awakened the next morning Anna Marie was missing. The ensuing search was fruitless. Early portions of the investigation focused on Robert Emry. Morgan was not initially considered a suspect because he had given several consistent accounts of his actions that evening and his son Robbie had provided him with an alibi. Eventually, however, investigators asked Morgan to take a polygraph examination to clear himself, and he agreed to do so.

It was arranged for Morgan to take a polygraph examination in Cedar Falls on August 17 to accommodate his work schedule. While in Cedar Falls on that date for that purpose, he made a detailed confession to the kidnapping, sexual assault, and murder of Anna Marie. He indicated on a map of Lee County where her body could be found. He later led authorities to a location where Anna Marie's partially decomposed body was found. He also located the knife used to commit the murder.

Ultimately, Robbie Morgan changed his story and testified against his father. According to Robbie, the following occurred after they left Brighton. After falling asleep in his father's truck, he awoke with Anna Marie next to him. After that his father stopped the truck three times, with Morgan and Anna Marie getting out each time. The first time, Anna Marie returned to the truck naked and asked to go home. After the second stop, she was crying when she returned to the truck and again asked to go home. When the truck stopped the third time, Morgan told Robbie not to look back. He testified that Anna Marie called for help about twenty times. When Morgan returned, he ordered Robbie not to say anything about Anna Marie and told him that they were leaving Anna Marie "back there."

The state medical examiner, Dr. Thomas Bennett, testified that Anna Marie had suffered twenty stab wounds, including one that punctured the heart and passed all the way through the left lung. She also suffered injuries consistent with sexual assault. Dr. Bennett concluded that she had attempted to resist her attacker.

At trial, Morgan denied all involvement with Anna Marie's disappearance and death. On January 12, 1995, a jury returned a verdict of guilty on counts of first-degree murder, first-degree kidnapping, and first-degree sexual abuse. On January 30, 1995, the district court imposed a life sentence, as required by statute, on all three counts. After Morgan appealed, we remanded this case for the purpose of developing an additional record on an issue involving the jury selection procedures.

Morgan assigns several grounds for reversal. These include: (1) an assertion that his confession was involuntary and was the result of improper questioning after he had sought an opportunity to consult with counsel, (2) that improper jury selection procedures were employed, (3) that a change of

venue should have been granted, and (4) that the first-degree sexual abuse charge merged in the other convictions. We consider each of these arguments and also consider the claim that Morgan received ineffective assistance from his trial counsel.

### I. Whether Morgan's Confession Was Invalidly Obtained.

Morgan argues that his confession was obtained in violation of his Fifth and Fourteenth Amendment privilege against self-incrimination under the Federal Constitution and article I, section 9 of the Iowa Constitution. Additionally, he argues that the confession was coerced, in violation of due process. For both reasons, he asserts that the trial court erred by failing to grant his motion to suppress his confession and the evidentiary fruits thereof. Because Morgan raises constitutional objections, our scope of review is de novo. *State v. Thomas*, 540 N.W.2d 658, 661 (Iowa 1995). The State must prove, by a preponderance of the evidence, that constitutional rights were knowingly waived and that statements of an inculpatory nature were voluntarily given. *See State v. Alspach*, 524 N.W.2d 665, 667 (Iowa 1994).

We find the following facts after our de novo review of the record. On August 17, 1994, Morgan drove to the Keokuk airport. He was then flown to Waterloo and driven to Cedar Falls for purposes of taking a polygraph examination. Both the trip and the polygraph examination had been consented to by Morgan before leaving Keokuk. Special agent Robert Ward of the Division of Criminal Investigation (DCI) and deputy sheriff Jack Dillon accompanied Morgan. Ward, Dillon, and Morgan arrived in Cedar Falls at approximately 2:30 p.m. The polygraph examination was to take place at the State Patrol Office in Cedar Falls. When Morgan arrived at the State Patrol Office, he was directed to a restaurant where he could obtain something to eat prior to the examination.

About forty-five minutes later, Special Agent Jeff Jacobson with the DCI requested Morgan to come inside the State Patrol Office for purposes of proceeding with the polygraph examination. Morgan went inside that office and entered a room reserved for poly-

graph examinations. Ward and Dillon observed from another room. Morgan signed a waiver-of-rights form pertaining to both the polygraph examination and any questioning incident thereto. Jacobson then began to ask him pretest questions about his physical and mental health and other aspects of his background. During this time, Morgan took a brief cigarette break. At 4:18 p.m. the pretest questions were completed. At this time, Morgan appeared to be in a highly agitated state.

At 5:35 p.m., when the polygraph examination was about to begin, Morgan left the office for another cigarette break. Jacobson told Ward and Dillon that he was uncertain that he could get an accurate reading because of Morgan's agitated state. The agents discussed this issue for about ten minutes while Morgan waited outside. Jacobson proceeded outside where Morgan told him he was distrustful of the polygraph examination and mentioned that he was thinking of seeking an attorney's advice. Jacobson testified at the suppression hearing that he told Morgan that he could use a phone to contact an attorney if he wished. Jacobson then consulted with Ward and Dillon about Morgan's possible desire to speak with an attorney. Agent Ward attempted to reassure Morgan concerning the polygraph examination. Morgan again expressed distrust for machinery such as the polygraph equipment and expressed concerns that he would be given "the third degree," with bright lights. During this conversation, Morgan did not mention a lawyer. Morgan and Ward returned to the Patrol Office where Morgan stated "let's get it over with."

Once inside, Morgan refused to take the polygraph examination. Faced with this development, the investigators present in Cedar Falls spoke by phone with their superior, who indicated that they should attempt to interrogate Morgan concerning the events of August 12 and 13. Agent Jacobson told Morgan that he had a few more questions for him. Questioning about Anna Marie Emry's disappearance commenced at 6:15 p.m. Jacobson offered several hypotheticals to Morgan. He asked Morgan what would happen if a global positioning satellite showed his

truck in the vicinity of Brighton, Iowa, later than the times he gave investigators. Jacobson asked what Morgan would say if a neighbor had seen him in Robert Emry's backyard during the evening in question. He also asked Morgan if he had sexually assaulted Anna Marie because his wife was not sexually satisfying him.

During this time, Morgan stated "I know I'm under arrest," which was not contradicted by the officers. Morgan also mentioned consulting with an attorney. The agents testified that Morgan said he "might" need an attorney. At trial Morgan testified that he had stated: "I think I need an attorney." At 6:34 p.m. Morgan asked for a Mountain Dew and an ashtray, which were provided to him. At 6:40 p.m. he confessed to taking Anna Marie from her uncle's home, sexually assaulting her, and killing her.

A. Miranda *issues.* Morgan argues that his Fifth Amendment rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were violated in several respects. The State responds with alternative contentions. First, it contends that Morgan was not "in custody." Thus, *Miranda* does not apply. Second, the State urges that if *Miranda* did apply, Morgan received the benefits of those rights. For purposes of discussion, we assume Morgan was in custody.

■ 1. *Adequacy of* Miranda *waiver contained in polygraph consent form.* Morgan argues that the waiver form he executed incident to taking the polygraph examination inadequately informed him of his *Miranda* rights with respect to his subsequent general interrogation. We set out the relevant language in the margin.[1] According to Morgan, the waiver form, by its language, applied to the polygraph examination alone. Morgan argues that after he refused to submit to the polygraph examination a new set of warnings

was necessary in order to permit further questioning of him.

The relevant rule is found in *Wyrick v. Fields,* 459 U.S. 42, 47, 103 S.Ct. 394, 396, 74 L.Ed.2d 214, 218–19 (1982). In *Wyrick,* the United States Supreme Court held that a pretest waiver of *Miranda* rights is effective for posttest interrogation "unless the circumstances changed so seriously that [the subject's] answers were no longer voluntary or unless [the subject] no longer was making a knowing and intelligent relinquishment or abandonment of his rights." 459 U.S. at 47, 103 S.Ct. at 396, 74 L.Ed.2d at 218.

We conclude that it was not necessary to give Morgan a fresh set of *Miranda* warnings after he refused to take the polygraph examination. The circumstances had not changed significantly so as to trigger *Miranda* anew. Less than three hours had passed between Morgan's signing of the *Miranda* waiver and his refusal to take the test. *See State v. Jump,* 269 N.W.2d 417, 424 (Iowa 1978) (interview after test not so remote in time as to require additional warning). The waiver form sufficiently explained Morgan's rights, and those rights were still fresh in his mind. Although the waiver-of-rights form had some language specific to the polygraph examination, it also advised Morgan of his right to remain silent and his right to counsel.

■ 2. *Invocation of the right to silence.* Morgan argues that he invoked his right to remain silent and that this invocation was not scrupulously honored as required by *Michigan v. Mosley,* 423 U.S. 96, 101–04, 96 S.Ct. 321, 325–26, 46 L.Ed.2d 313, 319–22 (1975). He asserts that his statement that he did not want to take a polygraph examination was an invocation of his right to halt any subsequent interrogation. We conclude that Morgan's refusal to take a polygraph examination did

1. The polygraph examination consent form stated:
 1. I have the right to remain silent.
 2. Anything I say can and will be used against me in a court of law.
 3. I have the right to talk to a lawyer and have him present with me while I am being questioned.
 4. If I cannot afford to hire a lawyer, one will be appointed to represent me before any questioning, if I so desire.

 5. I have the right to refuse to take this examination.
 6. I may discontinue this examination at any point.
 7. I can decide at any time to exercise these rights, and not answer any questions or make any statements.

not communicate a desire to cut off all questioning. *See United States v. Johnson,* 56 F.3d 947, 955 (8th Cir.1995) ("clear, consistent expression of a desire to remain silent" is necessary); *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir.1985) (refusal to take polygraph examination is *not* an invocation of the right to silence); *State v. Whitsel,* 339 N.W.2d 149, 152 (Iowa 1983) (discussion of potential need for an attorney not an invocation of right to silence). As a result, the officers were not precluded from initiating the interrogation that followed. *Johnson,* 56 F.3d at 955; *Whitsel,* 339 N.W.2d at 152.

3. *Invocation of the right to counsel.* Morgan claims that his statement "I think I need an attorney" constituted an invocation of the right to counsel. The State responds that any request for counsel was equivocal and, therefore, ineffective. In *Davis v. United States,* 512 U.S. 452, 462, 114 S.Ct. 2350, 2357, 129 L.Ed.2d 362, 373 (1994), the Supreme Court held that "maybe I should talk to a lawyer" constitutes an ineffective invocation of the right to counsel. Similarly, in *State v. Johnson,* 318 N.W.2d 417, 430 (Iowa 1982), this court concluded that an inquiry regarding the need or advisability of speaking with an attorney is not an invocation of the right to counsel.

■ Morgan contends that the statement indicating "I think I need an attorney," indicated that his mind was already made up on the matter and is thus sufficient to halt further interrogation. In denying Morgan's motion to suppress, however, the trial court found that he had in fact said that he "might need a lawyer" as testified by the officers. The court found that such a statement was analogous to the statement found in *Davis* to be insufficient to invoke a right to counsel. We agree. Although review on this constitutional issue is de novo, weight will be given to the trial court's findings of fact, as in other de novo appeals, because that court had an opportunity to assess the credibility of the witnesses. We find that Morgan did not successfully invoke his right to counsel.

■ B. *The voluntariness issue.* Morgan argues that his confession was obtained involuntarily, in violation of his due process rights. The applicable considerations are found in *State v. Payton,* 481 N.W.2d 325, 328–29 (Iowa 1992):

> The defendant's knowledge and waiver of his *Miranda* rights, the defendant's age, experience, prior record, level of education and intelligence, the length of time the defendant is detained and interrogated, whether physical punishment is used, including the deprivation of food or sleep, the defendant's ability to understand the questions, the defendant's physical and emotional condition and his reactions to the interrogation, whether any deceit or improper promises were used in gaining the admissions, and any mental weakness the defendant may possess.

In reviewing these factors, we consider the totality of the circumstances.

■ Morgan relies on the following circumstances: (1) he had little prior experience with law enforcement, (2) he was far from home and was nervous about flying, (3) the officers knew Jacobson made him nervous, (4) they ignored his invocations of silence and counsel, (5) the officers knew of his nervous condition and prior medication, and (6) the global positioning satellite hypothetical offered by agent Jacobson was improper. The State responds that Morgan came to Cedar Falls voluntarily and knowingly waived his *Miranda* rights. It urges that Morgan, a relatively bright high school graduate, had the sophistication to understand his situation and was familiar with the rudimentary workings of the criminal justice system, including his choice whether to be represented by an attorney. Although he had previously received prescription medication for a nervous condition, he had not required that medication for two years. Morgan was in no way physically abused. He was offered food, drink, and frequent cigarette breaks when he requested them.

We conclude that Morgan has failed to establish that his confession was the product of undue police coercion that overpowered his will. He came to Cedar Falls voluntarily and was treated with respect while there. He was aware of his rights and the consequences of waiving those rights. At one time, he was offered a chance to consult with a lawyer and failed to follow up on that

opportunity. Taken as a whole, the interrogation was not "so offensive to a civilized system of justice that [it] must be condemned." *Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 519, 93 L.Ed.2d 473, 481 (1986) (quoting *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 410 (1985)).

■ As a final challenge to the confession evidence, Morgan asks this court to impose, under the due process clause of the Iowa Constitution, a requirement that police must ask clarifying questions when faced with an equivocal request to consult with counsel and that suspect interrogations must, where feasible, be recorded. Requiring law enforcement personnel to record interrogations or to ask such clarifying questions are issues that may be argued both pro and con as matters of public policy. We are confident, however, that such procedures are in no way mandated by any provision in the Iowa Constitution. We reject Morgan's contention that they are.

## II. *Whether the Jury Selection Process Employed in Lee County Constitutes Reversible Error.*

■ Morgan argues that the jury selection procedures in Lee County violated his constitutional rights under the Sixth and Fourteenth Amendments to the Federal Constitution and article I, section 9 of the Iowa Constitution. He also contends that the process violated Iowa Code section 607A.10 because it did not involve a random selection of jurors. Concerning alleged statutory violations, we review for correction of errors at law. Iowa R.App. P. 4. For constitutional violations, we review de novo. *State v. Rhomberg,* 516 N.W.2d 803, 805 (Iowa 1994).

A. *Lee County's jury selection procedures.* For judicial purposes, Lee County is divided into North Lee County and South Lee County. Each division has its own courthouse. Jurors are to be separately selected for each subdivision from persons residing in that geographical area. Iowa Code § 607A.25 (1993). South Lee County Division consists of five townships. It appears that the master jury list at the time of Morgan's trial included persons who resided in the North Division of Lee County as well as a resident of another county. That circumstance was attributable to the use of post

office addresses to sort names in the selection process rather than precise geographical location. No juror who lived outside the county was actually called for jury duty on the case. Three of 114 potential jurors who were called resided in the South Lee County Division rather than the division where the trial was held. One of those persons actually served on the jury.

B. *Constitutional violations.* According to Morgan, Lee County's jury selection procedures, by including residents of South Lee County, violated the vicinage requirement of the Sixth Amendment dictating that districts shall have been previously determined by law. *See United States v. Grisham,* 63 F.3d 1074, 1078–81 (11th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 798, 133 L.Ed.2d 746 (1996). He argues that a similar requirement is contained in the Iowa Constitution. The State contends that no vicinage requirement is contained in the Iowa Constitution and that the Federal Constitution requires only that the trial take place in the same *federal* judicial district. *Grisham,* 63 F.3d at 1079–80.

■ There was no constitutional violation in this case. The State correctly notes that the vicinage clause of the Federal Constitution contemplates federal judicial districts. *Grisham,* 63 F.3d at 1079–80. After the Sixth Amendment was made applicable to the states by the Fourteenth Amendment, there is no reason to think that any narrower requirement would be applicable to the states.

■ Iowa's Constitution provides: "The right of trial by jury shall remain inviolate...." Iowa Const. art. I, § 9. We have stated that this clause preserves the right to a jury trial as it existed at common law. *Iowa Nat'l Mut. Ins. Co. v. Mitchell,* 305 N.W.2d 724, 726–28 (Iowa 1981). At common law, jurors were summoned from the vicinage where the alleged crime occurred. 47 Am.Jur.2d *Jury* § 111, at 807 (1995). The vicinage was "the county where the crime was committed, and the same meaning will ordinarily be given the term today." *Id.* Although a South Lee County resident served on Morgan's jury in an alleged violation of the statute subdividing Lee County,

we do not find that to be of constitutional significance. To determine whether one's jury trial rights have been violated, "the court turns to the common law, not to the statutes of the moment." *Mitchell,* 305 N.W.2d at 728. Morgan, having received a jury selected in accordance with the common law, has no grounds for a constitutional complaint.

C. *Adequacy of random selection procedures and residency of jury members under controlling statutes.* Morgan asserts that the method by which the jury list was compiled failed to follow the "random selection" requirements of Iowa Code section 607A.10. He also asserts that a South Lee County resident was improperly included in the North Lee County jury panel.

Our cases divide jury selection rules into two classes: mandatory rules and directory rules. *State v. Lohr,* 266 N.W.2d 1, 5–6 (Iowa 1978). The distinction is explained as follows:

> If the prescribed duty is essential to the main objective of the statute, the statute ordinarily is mandatory and a violation will invalidate subsequent proceedings under it. If the duty is not essential to accomplishing the principal purpose of the statute but is designed to assure order and promptness in the proceeding, the statute ordinarily is directory and a violation will not invalidate subsequent proceedings unless prejudice is shown.

*Id.* at 5 (quoting *Taylor v. Department of Transp.,* 260 N.W.2d 521, 522–23 (Iowa 1977)). After reviewing the record, we conclude that Morgan failed to show that a mandatory duty was violated or that a directory duty was violated to his prejudice.

We note that the computer program used to draw juror names complied with our statute. Although not mathematically random, it selected jurors "in a manner immune to any subjective bias so that no recognizable class of the population ... can be purposefully included or excluded." Iowa Code § 607A.3(9) (defining random selection). Potential jurors were selected based on the last number of their birth dates. That procedure, in our view, is not linked to impermissible discrimination on the basis of race, gen-

der, or other recognizable classifications within the population.

We also find that Iowa Code section 607A.25, the statute authorizing separate jury pools for separate divisions of a county, is directory, not mandatory. The only clear purpose we have been able to deduce for such a division is administrative ease. Each of the two courthouses serves a smaller number of people and is consequently more convenient to attorneys, court personnel, litigants, and potential jurors. There is no indication that Lee County was divided on the basis of insular and recognizable "communities" so that the fairness of the jury system may only be assured by maintaining separate judicial subdivisions. Consequently, in order to establish a basis for relief, Morgan must show he was prejudiced by the inclusion of a South Lee County resident on his jury. It is necessary to show in this regard some lack of qualifications or bias affecting the juror's impartiality and the fairness of the trial. *Bennett v. Lockhart,* 39 F.3d 848, 853 (8th Cir.1994); *United States v. Humphreys,* 982 F.2d 254, 261 (8th Cir.1992). Because no indication of bias or unfairness appears as a result of the South Lee County resident serving on the jury, that circumstance does not afford Morgan any basis for relief.

### III. *Whether the Trial Court Abused Its Discretion by Refusing to Order a Change of Venue.*

Noting the voluminous amount of pretrial publicity that this case received, Morgan argues that the trial court erred in not granting his motion for a change of venue. A district court's denial of a motion for a change of venue is reviewed for abuse of discretion. *State v. Siemer,* 454 N.W.2d 857, 860 (Iowa 1990).

Morgan notes the volume of coverage that this case received. He offered forty newspaper articles from media markets throughout the state, including some discussing the Morgan case in the context of efforts by the Governor to obtain a legislative reinstatement of the death penalty. Morgan emphasizes that almost all jurors had been exposed to the media coverage and many were chal-

lenged for cause based on their opinions in this case.

 Sheer volume of coverage is not sufficient to mandate a change of venue. Morgan must show he was prejudiced thereby. Morgan may demonstrate either actual prejudice or "that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed." *State v. Wilson*, 406 N.W.2d 442, 445 (Iowa 1987). We find that Morgan showed neither. First, Morgan offered no evidence of actual prejudice. Second, Morgan showed pervasiveness of coverage, but did not show that the coverage was inflammatory. *Siemer*, 454 N.W.2d at 860. When assessing the "inflammatory" nature of media coverage, we consider the following three factors: the nature, tone, and accuracy of the articles, their timing in relation to the trial, and the impact on the jury as revealed in *voir dire. Id.*

The media coverage of Anna Marie's disappearance and death were generally accurate and objective. This child's murder had captivated the public. This, however, was due to the sordid nature of the crime, not morbid or sensationalistic treatment by the media. Several of the articles make no mention of Morgan as a suspect. Almost all of the articles appeared several months before the trial began. *Cf. State v. Spargo*, 364 N.W.2d 203, 208 (Iowa 1985) (articles appeared months before trial: no prejudice). Finally, all jurors who stated that they had formed strong opinions on the case were excluded. Only those who stated that they could set aside previously formed opinions were retained. *Cf. Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961). We conclude that the trial court did not abuse its discretion by refusing to order a change of venue.

### IV. *Whether the Trial Court Properly Imposed Sentence for First–Degree Sexual Abuse.*

 We agree with Morgan that his conviction for first-degree sexual abuse should be vacated. We so decide because sexual abuse is a lesser offense included in first-degree kidnapping. We begin our analysis with Iowa Code section 701.9 (1993), which reads:

No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

The statute defining first-degree kidnapping states:

Kidnapping is kidnapping in the first degree when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse.

Iowa Code § 710.2. In *State v. Whitfield*, 315 N.W.2d 753, 755 (Iowa 1982), we held that the crime of sexual abuse was included in the offense of first-degree kidnapping when sexual abuse was the foundation for such a charge. *Whitfield* and Iowa Code section 701.9 control this case.

The State, attempting to avoid this result, relies on *State v. Holderness*, 301 N.W.2d 733, 740 (Iowa 1981). In *Holderness*, we affirmed convictions for sexual abuse and kidnapping in the first degree when two separate incidents of sexual abuse occurred. First, the defendant kidnapped and sexually assaulted the victim. Then, he transported her to another place and again committed another sexual assault. We approved a lower court decision convicting defendant for sexual abuse for the first sexual assault and first-degree kidnapping for the asportation and second sexual assault.

We subsequently have acknowledged the limits of *Holderness*. In *State v. Newman*, we held that the rule of merger applied, even though evidence indicated that two sexual assaults took place. 326 N.W.2d 788, 793 (Iowa 1982). We wrote:

In the instant case, the matter was tried and submitted to the jury as one continuing event. *The State did not prove some sexual acts as a predicate for the kidnapping charge and other such acts as the basis for a separate and distinct crime of sexual abuse nor was the case submitted to the jury that way.* Instead the prosecution from start to finish was treated by all

concerned as a single episode. The State cannot depart from that course now.

*Id.* (emphasis added). After examining the manner in which these charges were submitted to the jury, we cannot sustain Morgan's sexual abuse conviction. The jury received one standard instruction each on the elements of kidnapping and of sexual abuse. The abduction and sexual assault of Anna Marie was presented to the jury as a single transaction. Although sufficient evidence would support a finding that two sexual assaults took place, one as a predicate for first-degree kidnapping and one as a separate occurrence of sexual abuse, that is not our inquiry under *Newman.* The jury instructions and verdict forms indicate that the jury considered the evidence as proof of a single chain of events. We vacate that portion of the judgment and sentence relating to the charge of first-degree sexual abuse.

### V. *Whether Morgan Received Ineffective Assistance of Counsel.*

■■■■■ As this is a constitutional claim, review is de novo. *Kellogg v. State,* 288 N.W.2d 561, 563 (Iowa 1980). Morgan bears the burden of demonstrating ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 688–90, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674, 693–94 (1984); *State v. Risdal,* 404 N.W.2d 130, 131–32 (Iowa 1987). Morgan must show that "under the entire record and totality of the circumstances" his attorney's performance was not "within the normal range of competence." *State v. Miles,* 344 N.W.2d 231, 233–34 (Iowa 1984). Morgan must show that his lawyer failed to perform an essential duty, and that failure resulted in prejudice. *Risdal,* 404 N.W.2d at 130–31.

Morgan's ineffective-assistance-of-counsel argument takes two forms. First, he uses it as a "backstop" in case we hold that his trial counsel failed to preserve error for appellate review on the following three issues: suppression of Morgan's confession, change of venue, and jury selection errors. Having considered these issues on the merits, we need not address any contention that Morgan's trial counsel did not adequately preserve those issues for our review. Second, Morgan asserts that his trial counsel failed to object to improper statements made by the prosecutor during closing arguments. We have considered this contention in the light most favorable to Morgan and find that it is without merit.

We have considered all issues, whether fully discussed or not, and conclude that the judgment of conviction on the first-degree sexual abuse charge must be vacated. In all other respects the judgments of the district court are affirmed. Costs of appeal are assessed ninety percent to the appellant and ten percent to the appellee.

**AFFIRMED IN PART AND VACATED IN PART.**