# IN THE COURT OF APPEALS OF IOWA

No. 13-0492
Filed December 24, 2014

**RANDY L. BLANCHARD,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

    Appeal from the Iowa District Court for Chickasaw County, Margaret L. Lingreen, Judge.

    Blanchard appeals the denial of his application for postconviction relief.

**AFFIRMED.**

    John J. Sullivan of Sullivan Law Office, P.C., Oelwein, for appellant.

    Randy L. Blanchard, Anamosa, appellant pro se.

    Thomas J. Miller, Attorney General, Kevin R. Cmelik, Assistant Attorney General, W. Patrick Wegman, County Attorney, and Denise Timmons, Assistant County Attorney, for appellee.

    Considered by Danilson, C.J., McDonald, J., and Sackett, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**SACKETT, S.J.**

Randy Lee Blanchard was convicted of first-degree murder, in violation of Iowa Code section 707.2(5) (2007), and child endangerment resulting in death, in violation of Iowa Code section 726.6(4), following the death of his infant daughter. He filed an application for postconviction relief contending his trial attorney was ineffective in a number of ways. He appeals, contending the district court erred in denying his application. We affirm.

**BACKGROUND EVIDENCE.** Aliya, the victim, was born on January 30, 2008, by Caesarian section at the Waverly Municipal Hospital to Annette Eilderts. Blanchard is the child's biological father. He and Eilderts were not married and were living together at the time in Nashua, Iowa. Eilderts's five-year-old son also lived in the home. Aliya left the hospital for the Blanchard-Eilderts home on Saturday, February 2, 2008. Her mother had been released two days earlier.

The day after the child came home was Super Bowl Sunday. A friend of Blanchard's, Rod Swartz, and Blanchard's mother and stepfather were visitors in the home that Sunday. During the course of the afternoon Eilderts had a problem that caused her to seek medical advice at a nearby hospital. Swartz stayed with the children while Blanchard took Eilderts to a nearby hospital. They returned later that day. Swartz slept in the Eliderts-Blanchard home that evening.

Blanchard started a new job the following Monday, February 4. The couple had only one car, so Eilderts drove Blanchard to his job, Swartz to a requested destination, and her son to school. Eilderts picked Blanchard up from

work that afternoon. In the evening the couple and the infant fell asleep in the same bed. They both admitted they had been drinking, and Eilderts was also taking strong pain pills to relieve the discomfort of her Caesarian section delivery.

Aliya was still sleeping in a bed with Blanchard and Eilderts when at 3:00 a.m. on Tuesday, February 5, 2008, the child woke. She had awakened earlier, and Eilderts had taken care of her needs then. This time Blanchard got up to feed her, ultimately bringing the infant back to the couple's bed. At the time, he had changed her clothing. He was to contend that while giving her a bottle the child seemed to be chocking and he put a finger in her throat, which caused her to bleed. Eilderts testified Blanchard told her that the child had vomited and that was the reason for the change of clothes. Eilderts testified that while Blanchard was up with the child she heard Blanchard tell the child to "shut up" and then she heard a sound like something hitting a glass coffee table. Blanchard contends that he believed the child to be chocking and he put his hand down her throat in an attempt to remove any obstruction and she bled a bit.

Eilderts woke Tuesday morning between five and five-thirty as Blanchard was getting ready for work. He left for work apparently before six o'clock taking the couple's only car. He called that morning to check on Aliya at about 7:30 as Eilderts was getting her son ready for school. Blanchard contends while he was on the telephone with Eilderts he heard Aliya crying loudly. Eilderts testified Aliya was unresponsive that morning and would not take a bottle but acknowledged that she did cry when Blanchard called home.

After the call from Blanchard, Eilderts walked with her son to his school a block or a block and a half from her residence and then returned home. She took Aliya with her. Blanchard returned home mid-morning. Aliya had a seizure shortly thereafter, and the couple took her first to the hospital in Charles City and then to Covenant Clinic in Waterloo. She subsequently was taken to Mayo Clinic in Rochester, Minnesota, where after an initial examination a doctor diagnosed her as having had suffered blunt force trauma to her head and vigorous shaking. The doctor found no evidence of external injury. Aliya was declared brain dead on Saturday, February 9, and died after being taken off life support on Monday, February 11. Numerous doctors saw the child and a number of possible reasons for her condition were ruled out.

Both parents were questioned and gave statements after Aliya was hospitalized in Rochester. Jack Lioa and Scott Reger, agents with the Iowa Division of Criminal Investigation, came to the hospital. Blanchard was first interviewed at the hospital. He was given no *Miranda* warning, and he did not ask to speak with an attorney. Blanchard testified he had little sleep at the time and was of the belief that if he told investigators he would not talk to them or tried to leave, he would be arrested.

Blanchard had a second interview at Olmstead County jail in Rochester, Minnesota, and again received no *Miranda* warnings beforehand. He also testified he believed that if he had tried to leave, he would have been arrested. Blanchard made some incriminating statements during the interviews. He

admitted he had shaken the baby and possibly dropped her on a sofa. He was allowed to leave after each session.

An autopsy was done by Eric Pfeifer, M.D., and the doctor determined the child's cause of death was blunt force trauma to the head with blunt force injury to the brain. The doctor confirmed she had bleeding in the brain, multiple bruises along the base of her spine, and a fractured skull. He also confirmed the optic nerve had incurred a sheath hemorrhage that is consistent with inflicted head trauma. The doctor ruled out a list of other possible causes of death.

Blanchard was charged by trial information on February 21, 2008, with first-degree murder, a Class "A" felony, in violation of Iowa Code sections 707.2(4) and 726.6(4). On April 1, 2008, attorney David F. Staudt of the Waterloo Public Defender's Office filed a waiver of the right to a speedy trial on Blanchard's behalf, and on November 10, 2008, he asked for additional time to file pretrial motions and defenses. The motions were granted and a trial date was continued to May 18, 2009.

On February 17, 2009, Blanchard signed and filed a waiver of right to jury trial. The waiver by Blanchard acknowledged he knew he had statutory and constitutional rights to trial by jury and he had been advised of the ramifications of waiving the right. He was advised that in assessing the waiver the court would inform him that twelve members of the community compose a jury, he could take part in jury selection, jury verdicts must be unanimous, the court alone decides guilt or innocence if he waives a jury trial, and that the court will determine

whether he is under the erroneous impression he will be rewarded by either the court or the prosecution for waiving a jury trial.

On the same day the waiver was filed, Blanchard appeared in district court. Staudt indicated Blanchard was waiving a jury trial, and the district court reviewed with Blanchard the rights he was giving up. The court then addressed Staudt, indicating that under *State v. Stallings*, 658 N.W.2d 106, 108 (Iowa 2003), *overruled on other grounds by Feregrino*, 756 N.W.2d at 708, some record needed to be made as to the benefits Blanchard would receive by waving a jury trial.

Staudt responded, telling the court that there were a number of things he could discuss that he thought would involve attorney-client privilege but there were additional factors relating to five medical doctors who would testify about complicated issues concerning the death of a baby and the causes and timing and medical conditions. Staudt indicated he believed the court may have a better understanding of the issues and facts than would a jury. After making certain findings, the court granted Blanchard's request that the jury be waived and ordered that the case would proceed to a bench trial.

Also on February 17, 2009, the State filed an extensive motion in limine and a request for ruling on the admissibility of Blanchard's prior bad acts. The hearing was held on March 3, 2009. The district court filed a written ruling on March 9, 2009, addressing the matters it had considered at the hearing. Among other things, the court addressed the State's claim that evidence of Blanchard's 1997 conviction for child endangerment was admissible. That charge was the

result of a January 14, 1997 incident where Blanchard admitted to twisting and grabbing a three-month-old infant's legs, breaking one leg. In its ruling on the question of admission of Blanchard's guilty plea, the court noted the guilty plea may be relevant to any claim the alleged victim's injuries were accidental. The court held the probative value of the evidence was outweighed by the danger of unfair prejudice and the evidence should not be introduced at trial. It went on to say that it would not consider the conviction in determining Blanchard's guilt.

Apparently Blanchard filed no pretrial motions; if he did, they are not at issue. The bench trial began on March 18, 2009. It was suspended because of court furloughs on March 20, 2008, and reconvened on March 23, 2009. The evidence was concluded on March 25, 2008. Blanchard did not testify at trial. In its ruling, the court made extensive findings of fact and found Blanchard guilty of murder in the first degree, in violation of Iowa Code section 707.2(5), and of child endangerment resulting in death, in violation of section 726.6.

On March 8, 2009, Blanchard filed a motion for new trial raising a number of issues, and on May 26, 2009, the district court denied the motion. Blanchard appealed, contending there was insufficient evidence to support his conviction and that based upon principles set forth in *State v. Heemstra*, 721 N.W.2d 549 (Iowa 2006), the murder conviction could not stand. The matter was transferred to this court, which denied his claims on both issues and affirmed his convictions. *State v. Blanchard*, No. 09-0871, 2010 WL 2089222, at *6 (May 26, 2010).

Blanchard subsequently filed the petition for postconviction relief that leads to this appeal. He alleged his trial attorney was ineffective in a number of

ways including: (1) not requesting a jury trial, (2) advising him not to testify, (3) failing to request an alibi instruction, (4) failing to call his mother, Sherry Hanson, to testify to admissions Eilderts made to her, (5) failing to obtain a copy of a statement given by Eilderts to the police, (6) failing to make a record of judicial bias at trial, (7) failing to request a new trial, (8) failing to claim double jeopardy based on a conviction of child endangerment and murder in the first degree, (9) failing to require a new trial because the verdict was contrary to the evidence, and (10) failing to seek suppression of statements he made to law enforcement officers. The district court denied Blanchard's petition in all respects except to file a separate order setting aside the sentence on the charge of child endangerment resulting in death.

**ISSUES ON APPEAL.** In appealing the denial of postconviction relief, Blanchard contends his trial counsel was ineffective in failing to: (1) file a motion for a new trial, (2) advise him to request a jury trial, (3) call his mother as a witness, (4) challenge the district court's finding he voluntarily waived his right to a jury trial, and (5) file a motion to suppress statements he made to law enforcement prior to his arrest.

**INEFFECTIVE ASSISTANCE OF COUNSEL.** Claims of ineffective assistance of trial counsel are judged using a two-pronged test. *See Ledezma v. State,* 626 N.W.2d 134, 141 (Iowa 2001); *Osborn v. State,* 573 N.W.2d 917, 922 (Iowa 1998). To establish deficient performance, the applicant must prove counsel failed to raise an issue a reasonably competent counsel would have raised. *Ledezma,* 626 N.W.2d at 141. However, "[s]electing assignments to

assert as grounds for reversal is a professional judgment call [courts] are reluctant to second-guess." *Osborn,* 573 N.W.2d at 922. To prove an attorney's deficient performance resulted in prejudice, the applicant must show the underlying claim would have prevailed if it had been raised. *See Ledezma,* 626 N.W.2d at 141. Consequently, we review the merits of the underlying claim to determine whether Blanchard's trial counsel was ineffective. *See id.* at 141-42. We recognize counsel has no duty to raise an issue that has no merit. *See State v. Dudley,* 766 N.W.2d 606, 620 (Iowa 2009). We review ineffective-assistance-of-counsel claims de novo. *See Ledezma,* 626 N.W.2d at 141.

**1. FAILURE TO FILE A MOTION FOR NEW TRIAL.** Blanchard contends that his trial counsel had a duty to file a motion for new trial based on the argument that the verdict was contrary to the evidence. The postconviction court found that Blanchard's trial counsel had no basis to file such a motion. The State argues that the record shows Blanchard's attorney filed such a motion and it was denied. The State further argues that Blanchard's attorney had no obligation to file such a motion because the verdict was not contrary to the weight of the evidence.

The record reflects that a motion for new trial was filed seeking relief on the basis that the evidence was insufficient to support the court's verdict, and on May 26, 2009, the district court denied the motion. Furthermore, this court on direct appeal found on review of the evidence and the district court's finding determined that "there is substantial evidence to support Blanchard's convictions." We affirm on this issue.

**2. WAVIER OF JURY TRIAL.** Blanchard contends the postconviction court erred on February 17, 2009, when it made a finding he had knowingly and intelligently waived his right to a jury trial, entered a written waiver, and addressed the court on the record. It is clear that Blanchard signed a waiver that gave him the information as to the effect of the waiver. Furthermore, the State claims, and we agree, that the district court also verbally gave the necessary information to Blanchard. However, even if the court failed to do so, Blanchard must show prejudice in order to succeed on a claim of ineffective assistance of counsel based on a lack of a knowing and voluntary waiver of the right. *See Feregrino*, 756 N.W.2d at 708; *State v. Straw*, 709 N.W.2d 128, 137-38 (Iowa 2006).

Blanchard's attorney testified in the postconviction proceedings that he felt Blanchard had a better chance for an acquittal if the case were tried to the court. He further said he felt the court's knowledge of Blanchard's prior conviction would not make a difference, alluding to the court's assertion that it would not take the prior conviction into consideration. He also testified that he was concerned that if there were a jury trial and Blanchard testified, the jury may have become aware of the prior conviction.

Blanchard points out that only after he waived the jury trial did the court rule the evidence was not admissible because its probative value outweighed its prejudicial effect. He argues that had there been a jury trial, the jury would not have known of the prior offense but that the court did know all the facts of it and found it prejudicial. Blanchard contends that while his attorney accepted the fact

that the court would not consider the prior offense, it is a "legal fiction" to believe his earlier conviction for child endangerment "would not work upon or influence" the court. He also argues that the court may have taken this conviction into consideration because of a remark the court made at the time of sentencing.

> THE COURT: At the conclusion of the last hearing Mr. Blanchard, you told me that I'm a biased judge.
> THE DEFENDANT: You are.
> THE COURT: I am biased against people who take the lives of children.

The State argues that Staudt was not ineffective because its request to admit evidence of Blanchard's prior convection was not made until after the ruling providing for trial to the court because at the time of the waiver, the court did not know of the prior incident where Blanchard pled guilty to a charge of child endangerment on January 30,1998.[1] On February 17, 2009, the State filed a motion seeking, among other things, a pretrial ruling of admissibility of certain evidence. On March 10, 2009, the court ruled on the motion, finding that Blanchard had pled guilty to assault of a small child and this evidence may be relevant to an argument Blanchard made that the injuries to the child here were a result of an accident. The court then went on to rule that even if relevant, the evidence was not admissible as the probative value was far outweighed by its prejudicial effect, finding any evidence of Blanchard's prior bad acts—including the conviction of child endangerment in 1997—inadmissible.

The State further contends that Staudt could not be deemed ineffective for not later invoking Blanchard's right to a jury trial because the trial court had

---

[1] The motion was filed the same day as the waiver was made and accepted by the court.

agreed not to take the prior conviction into consideration. The State further points out that nothing in the district court's ruling shows the court took that evidence into consideration.

The adequacy of a jury-trial waiver is a mixed question of law and fact, which we review de novo. *Feregrino*, 756 N.W.2d at 703. We review Blanchard's claim with regard to a jury trial in view of the great solicitude of courts for jury trials. *Stallings*, 658 N.W.2d at 106. We are mindful that the district court's ruling on a jury waiver is a matter vested in the courts sound discretion. *Feregrino*, 756 N.W.2d at 703

The State argues that the court made it clear it would not take the information into consideration. Blanchard argues that the facts of the 1997 conviction would work upon the court's mind. He further argues that the record shows that the court may have taken his prior conviction into consideration because it said in sentencing Blanchard said that it was biased against parents that harm their children in response to Blanchard's charge that the court was biased. He also contends that once the court ruled to prohibit the prior conviction, trial counsel was within its ability to reassert the jury trial right on Blanchard's behalf and should have reasserted it.

The court said it would not consider the conviction, and a careful reading of the decision convicting Blanchard makes it clear it based its determination on the facts elicited at trial and not on the prior conviction.

As to Blanchard's charge the court showed its prejudice when it made the statement regarding people who injure children, we find it may have been ill-

advised, but it is not sufficient to show the court considered the earlier conviction in making a finding of guilt for the statement was not made until the sentencing hearing, and having been convicted for first-degree murder, Blanchard's sentence was set by statute. We affirm on this issue.

**3. STATEMENTS TO LAW ENFORCEMENT.** Blanchard was charged with the child's murder after he gave two statements regarding his action to the police. He did not to testify. No objections were made at trial to the admission of his two statements. Blanchard contends his trial counsel was ineffective in failing to file a motion to suppress these statements. The State contends the statements were voluntary. Blanchard contends neither waiver was voluntary, he was in custody at both times, and he was not informed of his *Miranda* rights.

The *Miranda* warnings protect a suspect's Fifth Amendment right against self-incrimination "ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Because the defendant's appeal of a motion to suppress implicates constitutional issues, our review is de novo. *State v. Morgan*, 559 N.W.2d 603, 606 (Iowa 1997). If Blanchard's trial attorney had challenged the admission of Blanchard's statements, the State would have been required to prove Blanchard was adequately informed of his *Miranda* rights, understood them, and knowingly and intelligently waived them. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.");

*Morgan*, 559 N.W.2d at 606. The State would also be required to prove Blanchard gave his statement voluntarily. *See Morgan*, 559 N.W.2d at 606. The State would have had to prove by a preponderance of the evidence that Blanchard knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See State v. Ortiz*, 766 N.W.2d 244, 249 (Iowa 2009)

Blanchard contends that at both times he was questioned he was in custody. He contends that he believed that if he did not talk to the officers they would arrest him. He argues that while he was free to leave, it is apparent their purpose was to obtain incriminating admissions from Blanchard as to his contact with his daughter and he had understood his situation to be one of custody.

In *Ortiz*, 766 N.W.2d at 251, the court noted *Miranda* provides that a suspect is in custody under formal arrest or under any other circumstances where he is deprived of his freedom of action in any significant way. Whether the facts surrounding the first interview would support a finding that Blanchard's freedom was impacted in a significant way, we need not decide. In the second interview, Blanchard was transported by the officers to the police station where the interview took place. He was confronted with his actions concerning the child's death and the facts would indicate he could well assume, as he testified, that he was not free to leave. He was not given *Miranda* warnings. Therefore the question is whether his trial counsel's failure to file a motion to suppress prejudiced him.

Blanchard argues that the failure to file the motion to suppress prejudiced him and affected the outcome of the case because it was likely the State would

not have had enough evidence to convict him without he statements. We disagree. In its fact-findings, the trial court noted Dr. Carey's impressions of Blanchard's behavior during Aliya's stay at Mayo Clinic. It noted Dr. Carey was "taken aback" by the fact Blanchard "showed little or no emotion and did not seem overwhelmed by the situation," as well as the fact that he "appeared more concerned with the doctor's opinion as to how this may have happened rather than the likelihood of his daughter's survival." Although Blanchard initially denied knowing how Aliya's injuries could have occurred, he later told Dr. Blanchard that "he may have struck her head on a microwave door while preparing her bottle." Blanchard told Dr. Billings he admitted to law enforcement that he had become frustrated with Aliyah and shook her while on the couch. At that point, Blanchard appeared to be "very distraught" and stated he could not live with himself if Aliyah died. Another doctor who observed Blanchard at the hospital found it strange that Blanchard appeared to be laughing and joking and talking about video games with his mother rather than expressing concern for his child's welfare. Coupled with Eilderts's testimony about what she heard during Blanchard's 3 a.m. feeding of Aliyah and Blanchard's behavior on the morning of February 5, 2008, there is not a reasonable likelihood the outcome of trial would have been different had the statements been suppressed. Because Blanchard is unable to show prejudice, we affirm on this issue.

**4. FAILURE TO CALL BLANCHARD'S MOTHER AS A WITNESS.** Blanchard contends that his attorney should have called his mother, Sherry Hanson, to testify as to statements Eilderts made regarding what Eilderts may

have done to Aliya.  At the postconviction hearing, Hanson testified that Eilderts had called her one day seeking Blanchard's last paycheck and said,

> "Aliya got—got hit," or she swung Aliya against a board, is what she told me.
> I go, "What the hell did you do that for?"  "I don't know," and then she said she did it twice on the couch.  She hit—she swung the baby down and hit—

Hanson testified she had this phone call with Eilderts before the trial and she told Staudt about Eilderts's statements by phone twice but Staudt was not interested in this information.

Hanson also testified she had an opportunity to discuss the facts of the case with Staudt.  On cross-examination she admitted her aunt told her to tell Blanchard not to hurt the child and she told him prior to the child's birth that she would kick him if he hurt the child.  She also indicated she was aware Blanchard had gone to prison for hurting an infant.

Staudt responded to this complaint, indicating that he realized Eilderts had sole care of the child between the time Blanchard left for work and returned home so he deposed her and she was calm, sweet, and did not appear to be someone you would believe would have harmed a young child.

Staudt further testified:

> [T]here were some factors that went into that.  Her behavior beforehand, her remorse, a number of other things that went into that.  And so it just made more sense and I felt that Randy stood a better chance, that it would be more difficult for a district court judge to say beyond a reasonable doubt that the only person that had the capabilities or the opportunity or the ability to harm this child was Randy.
> . . . I talked to Randy about this—and given the fact a judge would have to issue a written verdict and establish proof beyond a reasonable doubt in the judge's mind as to what—whatever

reasoning he or she felt that proved Randy guilty beyond a reasonable doubt stood a much better chance on appeal, if he were to lose, than the simple jury verdict of guilty or not guilty.

. . . [T]here were things that we could poke at Annie[2] to discredit some of her testimony and to discredit some of her believability.

But I did not believe it would be enough to overcome what a jury—I just felt that a jury was going to look at his case and they were going to say this young child was perfectly healthy until point X. Between that point and the next time we know, there was a doctor involved and something horrible happened to this child; and at that point, there were only two people that were in charge, and Annie just did not—I—I didn't believe a jury would believe that she was the one who did it. So it made more sense to us from a strategy scenario to try it to a judge.

The postconviction court found there was no credible support in the record that Eilderts confessed to Hanson that Eilderts struck the child twice while on the couch, noting it appeared this account was given for the first time at the postconviction hearing.

A review of the record shows that either parent was in a position to inflict the injuries that led to the child's death. The doctors were unable to fix an exact time of injury. Both parents were drinking on Monday evening, and in addition, Eilderts was on pain medication. It is conceded that the child cried while Blanchard talked to Eilderts on the telephone. While Eilderts contends that the child was not taking a bottle after Blanchard left home in early morning, the seizure did not occur until after he returned, and she was in total control of the child for several hours.

Staudt acknowledged that Hanson had told him about Eilderts's statements. However, Staudt viewed the statements as Eilderts "blaming herself

---

[2] Annie is a nickname for Eildert.

for her child's death because she felt guilty about leaving the child alone with [Blanchard]," not an admission of wrongdoing. Staudt was also concerned that if Hanson testified, damaging statements she made to the police about Blanchard might be introduced.

The postconviction court resolved this issue finding calling Hanson as a witness would not have changed the outcome. We agree and affirm on this basis.

**5. WAIVER OF RIGHT TO TESTIFY.** Blanchard contends the postconviction court erred when it concluded he knowingly and voluntarily waived his right to testify. He claims counsel was ineffective in advising him against testifying.

Counsel has a duty to advise a defendant on the consequences of testifying to allow the defendant to make an informed decision as to whether to testify. *Ledezma*, 626 N.W.2d at 146-47. "Generally, the advice provided by counsel is a matter of trial strategy and will not support a claim of ineffective assistance absent exceptional circumstances. However, when a defendant follows the misinformed advice of counsel concerning the consequences of testifying, ineffective assistance of counsel may occur." *Id.* at 147.

Staudt testified he provided Blanchard with different options and explained what could happen if Blanchard decided to testify and what could happen if he decided not to testify. Those scenarios included being confronted with prior felony convictions, as well as a prior conviction for child endangerment. Blanchard argues that counsel's advice was hindered by his failure to adequately

prepare. Specifically, Blanchard argues that most if not all of his prior felony convictions were more than ten years old and therefore counsel could have obtained a ruling on their admissibility before advising him.

We find Blanchard has failed to prove he was prejudiced by not testifying. He makes the blanket statement that by not testifying, he was unable to "provide more details regarding the facts of the matter and his defense to the charge." He does not state what these facts would have been or how they would have likely changed the outcome of trial. Accordingly, we affirm on this issue.

**AFFIRMED.**